Bilajac v Fariwa (2024 NY Slip Op 51048(U))

[*1]

Bilajac v Fariwa

2024 NY Slip Op 51048(U)

Decided on August 12, 2024

Supreme Court, Kings County

Mallafre Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on August 12, 2024
Supreme Court, Kings County

Lejla Bilajac, as the Administrator of the Estate of 
 OSCAR EDUARDO EUCEDA, JR., deceased, Plaintiff,

against
Victor Zaki Fariwa, M.D., AMY ROSE MATHEW, M.D., EMERGENCY MEDICAL SERVICES OF NEW YORK CITY FIRE DEPARTMENT, CITY OF NEW YORK, CONEY ISLAND HOSPITAL, NEW YORK CITY HEALTH AND HOSPITALS CORPORATION and MAIMONIDES MEDICAL CENTER, Defendants.

Index No. 501964/2019

Plaintiff
Aleksey Feygin, Esq. (alekseyfeygin@adbokat.com)
Mark M. Basichas & Associates P.C.
233 Broadway, Rm 2707
New York, NY 10279
212-476-0999
Defendant Victor Zaki Fariwa, M.D.
Joy Woda Schneider, Esq. (jschneider@kerleywalsh.com)
Kerley, Walsh, Matera & Cinquemani, P.C.
2174 Jackson Ave
Seaford, NY 11783
516-409-6200
Defendants Amy Rose Mathew, M.D. and Maimonides Medical Center
Laura Shapiro, Esq. (laurashapiro@mcf-esq.com) McAloon & Friedman PC
1 State St, Fl 23
New York, NY 10004
212-732-8700
Defendants Emergency Medical Services of New York City Fire Department and City of New York
Mark I. Friesz, Esq. (mafriesz@law.nyc.gov)
New York City Law Department
233 Broadway, Fl 15
New York, NY 10279
212-356-7173
Defendants Coney Island Hospital and New York City Health and Hospitals Corporation
Andrew J. Pinon, Esq. (andrew.pinon@wilsonelser.com)
Wilson Elser Moskowitz Edelman & Dicker LLP
150 East 42nd Street
New York, NY 10017
212-915-5459

Consuelo Mallafre Melendez, J.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:
NYSCEF #s: Seq. 9: 204 — 206, 208 — 236, 304 — 305, 306 — 312, 313 — 315
Seq. 10: 238 — 240, 241 — 265, 316
Seq. 11: 267 — 269, 271 — 288, 318
Seq. 12: 289 — 291, 292 — 298, 317
Seq. 13: 299 — 300
Defendant Victor Zaki Fariwa, M.D. ("Dr. Fariwa") moves (Seq. No. 9) for an Order, pursuant to CPLR 3212, granting summary judgment in his favor, dismissing Plaintiff's complaint against him in its entirety, and amending the caption to remove Dr. Fariwa.
Defendants Emergency Medical Services of New York City Fire Department and City of New York ("City Defendants") move (Seq. No. 10) for an Order, pursuant to CPLR 3211 (a) (7) or CPLR 3212, dismissing the complaint and all cross claims against them.
Defendants New York City Health and Hospitals Corporation ("NYCHHC") s/h/a Coney Island Hospital and New York City Health and Hospitals Corporation move (Seq. No. 11) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing Plaintiff's complaint against them in its entirety, or in the alternative, granting partial summary judgment as to any claims on which there are no triable issues of fact. NYCHHC also moves separately (Seq. No. 13) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor on the issue of informed consent and dismissing Plaintiff's ninth cause of action.
Defendants Amy Rose Mathew, M.D. ("Dr. Mathew") and Maimonides Medical Center [*2]("Maimonides") move (Seq. No. 12) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing Plaintiff's complaint and all cross claims against them.
Plaintiff opposes all Defendants' motions with the exception of NYCHHC's second motion (Seq. No. 13) to dismiss the ninth cause of action for lack of informed consent. That motion is accordingly granted without opposition, and the claim of lack of informed consent against NYCHHC/Coney Island Hospital is hereby dismissed.
Plaintiff commenced this action, as administrator of the estate of Oscar Eduardo Euceda Jr. ("Decedent"), on January 28, 2019, asserting claims of medical malpractice and wrongful death in connection to treatment and care rendered from December 25, 2017 through December 31, 2017.
Decedent presented to his primary care physician Dr. Fariwa on the evening of December 25, 2017 with respiratory symptoms that began two days prior, including shortness of breath, weakness, fever, chest pains, and coughing up blood. He was 27 years old with a history of obesity (weighing 384 pounds), hypertension, asthma, COPD, and sleep apnea. Dr. Fariwa advised him to go to the emergency room at Maimonides.
Arriving at Maimonides at approximately 9:00 p.m., Decedent was evaluated by attending physician Dr. Mathew. Dr. Fariwa testified that he also went to see him at Maimonides at approximately 11:00 p.m. but did not keep notes of his examination; he left before Decedent was discharged. Dr. Mathew recorded that his lungs were clear bilaterally without wheezing, rhonchi, or rales, and ordered a chest x-ray and other tests.
The chest x-ray was performed at 12:22 a.m. on December 26 and was interpreted by radiologist Dennis Giordano, M.D. ("Dr. Giordano"). Dr. Giordano's results noted that the study was "limited by body habitus and poor penetration," but reported no evidence of acute pulmonary disease.
Decedent was discharged from Maimonides emergency department around 3:00 a.m. on December 26 with a diagnosis of bronchitis. His flu test returned positive for influenza-A after his discharge. Dr. Mathew testified that she contacted Dr. Fariwa about this result.
On the evening of December 26, Decedent followed up with Dr. Fariwa at his office. Dr. Fariwa recorded bilateral wheezing on examination but also wrote Decedent's shortness of breath had subjectively improved from the previous day. Dr. Fariwa testified that he had received the flu diagnosis from Dr. Mathew, and his notes reflect that he prescribed Tamiflu along with antibiotics and advised Decedent to follow up with 24 hours.
Dr. Fariwa testified that he did not see Decedent again after December 26, though Decedent's mother testified that they made two or three visits to his office between December 27 and December 30. There is no record of office notes or billing records from those alleged visits. Pharmacy records submitted by Plaintiff show that Dr. Fariwa issued a prescription for Decedent for prescription-strength Ibuprofen on December 27. In his deposition, Dr. Fariwa testified that this prescription was issued after Decedent's father visited his office, and he had no in-person or telephone contact with Decedent on that date.
On December 31, sometime after 4:00 a.m., Decedent awoke in respiratory distress and told his fiancé (Plaintiff-administrator) that he could not breathe or see. His mother called 911. City paramedics Daniel Almandoz and Paul Lananna from an Advanced Life Support (ALS) unit arrived first on the scene at 4:44 a.m. Decedent's oxygen saturation was critically low at 60% and rose only to 72% as they administered supplemental oxygen, albuterol and atrovent (nebulizers), and dexamethasone (steroid). A Basic Life Support (BLS) unit arrived at 5:05 a.m. [*3]and helped transport Decedent down the stairs to an ambulance.
Decedent arrived at Coney Island Hospital via ambulance at approximately 5:30 a.m. with acute respiratory distress syndrome (ARDS). A portable chest x-ray interpreted by radiologist Timothy Bell, M.D. revealed "bilateral patchy dense pulmonary opacities consistent with pneumonia." Decedent was initially placed on BiPAP, a non-invasive oxygenation method, at 5:50 a.m. by emergency department physician Aleksandr Shestak, M.D. ("Dr. Shestak"), while nebulizers, steroids, and antibiotics were administered.
The Coney Island Hospital record is unclear on exactly what time Decedent was switched from BiPAP to a mechanical ventilator. Resident Nirav Patel, D.O. ("Dr. Patel") entered a procedure order for intubation into the chart at 7:37 a.m., but the first record of ventilator settings was entered at 6:58 a.m. A progress note from respiratory therapist Viktor Grytskiv from 7:01 a.m. stated that Decedent was placed on BiPAP but "due to no improvement on the BiPAP, patient was intubated." A nursing note entered by Olena Movchan stated that at 7:30 a.m., medication was administered because Decedent was "waking up and trying to fight ventilator." Once on the ventilator, Decedent's settings were adjusted on the recommendations of MICU physicians.
At some time before 8:00 a.m., Coney Island Hospital contacted Maimonides for Extracorporeal Membrane Oxygenation (ECMO), a life support measure which bypasses the heart and lungs to deliver oxygen. The Maimonides team arrived shortly before 10:00 a.m., but Decedent went into cardiac arrest twenty minutes into the ECMO procedure. Resuscitation efforts failed, and Decedent was pronounced dead at 11:05 a.m. An autopsy report determined his cause of death was morbid obesity with bronchopneumonia and cardiac hypertrophy.
Broadly, Plaintiff alleges that Decedent's primary care physician Dr. Fariwa and the emergency department at Maimonides, including Dr. Mathew, failed to properly diagnose and treat Decedent for pneumonia when he presented with symptoms on December 25-27. Plaintiff also alleges that the EMS Advanced Life Support team and Coney Island Hospital failed to timely intubate Decedent on December 31. Plaintiff alleges that these departures from each of the Defendants were a proximate cause of Decedent's pain and suffering and his death.
Firstly, the Court will address the City Defendants' motion (Seq. No. 10) to dismiss the claims and/or award summary judgment in their favor on the basis of the governmental function doctrine. The City Defendants argue that Plaintiff's complaint should be dismissed against them on three grounds. First, that Plaintiff failed to plead and cannot demonstrate that a "special duty" was owed to the Decedent. Second, that the actions of the EMS personnel were discretionary, not ministerial. Third, that the Emergency Medical Services of the New York City Fire Department is not an entity that can be sued under New York City Charter § 396, and therefore the agency should be removed from the caption.
On the last point, the City Defendants are correct that emergency medical services, the fire department, and similar agencies are not "separate legal [entities] amenable to being sued," and the action should have been brought against the City of New York only (see NY City Charter § 396; Brown v City of New York, 192 AD3d 963 [2d Dept 2021]). Plaintiff submits no argument in opposition as to removing the improperly named "Emergency Medical Services of the New York City Fire Department" defendant from the caption. Accordingly, that branch of the motion is granted.
When determining if the City itself is immune from liability, "the first issue for a court to decide is whether the municipal entity was engaged in a proprietary function or acted in a [*4]government capacity at the time the claim arose" (Applewhite v Accuhealth, Inc., 21 NY3d 420 [2013]). "A government entity performs a purely proprietary role when its activities essentially substitute or supplement traditionally private enterprises," while governmental functions are "undertaken for the protection and safety of the public pursuant to general police powers" (id.). "When a negligence cause of action is asserted against a municipality, and the municipality's conduct is proprietary in nature, the municipality is subject to suit under the ordinary rules of negligence applicable to nongovernmental parties" (Cockburn v City of New York, 129 AD3d 895 [2d Dept 2015]). Government entities sometimes act in a dual capacity performing traditionally private and public roles, such as acting as a landlord but also providing counter-terrorism security to the building (Heeran v Long Is. Power Auth. (LIPA), 141 AD3d 561 [2d Dept 2016]). The applicable question is whether they were acting in a governmental or propriety capacity in the conduct that gave rise to the claim (Ortiz v City of New York, 171 AD3d 1198 [2d Dept 2019]).
Once the determination is made that they were performing a governmental function, a municipality is generally immune from negligence liability for "a public employee's discretionary acts — meaning conduct involving the exercise of reasoned judgment" (Valdez v City of New York, 18 NY3d 69, 76 [2011]). This doctrine acts as a shield which protects "the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits" (id., quoting Mon v City of New York, 78 NY2d 309, 313 [1991]). This immunity does not apply as broadly when the acts or omissions are ministerial, involving "direct adherence to a governing rule or standard with a compulsory result" (Kralkin v City of New York, 204 AD3d 772 [2d Dept 2022]). However, government immunity also attaches to many ministerial acts, because in order to breach a duty toward the injured party, there must be "a special duty owed to the plaintiff, apart from any duty to the public in general" (id., quoting McLean v City of New York, 12 NY3d 194 [2009]). Thus, it is a long-standing principle that all discretionary government actions are immune from liability, and ministerial actions are also immune unless they involve a special duty. That duty arises, as outlined by the four elements of Cuffy v City of New York (69 NY2d 255 [1987]), where there is:
"(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) the party's justifiable reliance on the municipality's affirmative undertaking" (id.)
Here, the Court's first question is whether the City Defendants' actions were governmental or proprietary in nature, with respect to the conduct giving rise to Plaintiff's claims. Whereas medical and psychiatric care are traditionally seen as proprietary, with public hospitals and health providers holding the same duty of care as private institutions (see Schrempf v State, 66 NY2d 289 [1985]), it is well established by the courts that providing police, fire, and other emergency protection is a "classic governmental" function for the general safety of the public. As the Court of Appeals held in 2013, emergency medical services are closely associated with police and fire protection, and these services have "widely been considered one of government's critical duties" (Applewhite, at 428). Thus, Applewhite held that not only 911 dispatchers but "publicly employed, front-line EMTs and other first responders" are performing [*5]a governmental function.
Despite this seminal holding, Applewhite left an open question as to whether this immunity defense for basic front-line EMTs extends to publicly employed Advanced Life Support (ALS) paramedics, who have completed an advanced course of training to provide "organized acute medical care . . . on site or en route to, from, or between general hospitals or other health care facilities" (Public Health Law § 3001 [7], [11] — [12]). In fact, as part of its reasoning, the Applewhite majority acknowledged that the EMTs involved in that case "receive training in basic life support techniques and their range of approved emergency services is limited by law" (Applewhite, at 429). As the court explained,
"Basic EMTs function in a 'pre-hospital setting' and their activities are generally restricted to 'CPR, oxygen administration, bleeding control, foreign body airway obstruction removal, and spinal immobilization.' Most EMTs (who are not specially certified as paramedics) are not authorized by law to administer medication, such as epinephrine, or perform invasive procedures, and do not have access to advanced diagnostic and medical treatment equipment or physician assistance . . . all of which are common in public and private hospital facilities. EMTs cannot be realistically compared to the proprietary medical professionals whose licensure requires extensive educational and training credentials, and who typically provide services at hospital or medical facilities rather than in the unpredictable community-at-large" (id. [internal citations and footnotes omitted]).
Although ALS paramedics are designated as a type of "emergency medical technician" under the relevant statutes and regulations (see Public Health Law § 3001; 10 NYCRR 800.6), the court in Applewhite focused on the limited, basic life support duties of "most EMTs" who are "not specially certified." Their holding repeatedly acknowledged the "more sophisticated medical treatment" ALS paramedics could provide in contrast to the basic EMTs who merely administered CPR and waited for assistance.
Here, Plaintiff essentially bases their opposition to this motion on the theory that Applewhite has not been and should not be extended to ALS paramedics who possess more medical training and resources than basic EMTs. Plaintiff argues these advanced paramedics are more akin to private medical professionals and should be held to the same liability rules as health providers on the "proprietary" side of the line. Plaintiff cites no authority other than the concurrences in Applewhite to draw such a distinction, but correctly notes that there is some uncertainty over whether these acute medical care providers are part of the majority's "front-line EMTs and other first responders" analysis. Paramedics providing ALS services require additional licensure and "educational and training credentials" that basic EMTs do not, but they still provide services "in the unpredictable community-at-large" outside or between hospitals and care facilities.
Plaintiff seeks to distinguish this case from Applewhite by emphasizing that the alleged negligent acts and omissions were on the part of ALS paramedics, with the education and training to make more complex medical decisions in the field, including intubating a patient if warranted. Plaintiff alleges that the ALS personnel departed from the standard of care by failing to perform a medical procedure, i.e., to intubate Decedent at the scene of his apartment or en route to the hospital, despite remaining with him the entire time at issue. Instead, they administered oxygen, nebulizers, and a steroid. Plaintiff alleges that the fact the ALS paramedics [*6]did not intubate the patient in the field was a departure from the standard of care and a proximate cause of his sustained hypoxia and death.
To the extent that courts have dealt with this issue, few have provided guidance on whether to apply Applewhite's holding to advanced emergency responders in addition to basic EMTs, ambulance drivers, or 911 dispatchers. In Dixon v City of New York (120 AD3d 751 [2d Dept 2014], lv denied 26 NY3d 913 [2015]) — the closest Second Department case, which was decided on the heels of Applewhite — the plaintiff brought claims involving the 911 dispatcher, the BLS team that arrived first on the scene, and the ALS unit, alleging that all contributed to a delay in taking her to the hospital where she ultimately received an emergency C-section. In a brief decision, the Second Department found that all these actors were providing the "governmental function" of emergency medical services — and reaching the second step of analysis, the court held they each performed discretionary governmental functions, including the ALS paramedics "in reassessing [plaintiff's] condition upon arrival at the scene and in administering an IV before transporting her to the hospital" (id., at 753). However, there the plaintiff's claim was that transport to the hospital was delayed by all the EMS responders. This is a common claim against first responders that triggers a governmental immunity analysis, as facilitating hospital transport is a clear public service of a municipality's emergency response team. But courts have long held that it is possible for the same government parties to perform dual roles, traditionally public and private duties, and it matters what type of activity gave rise to the claim (see Ortiz, 171 AD3d 1198; Wittorf v City of New York, 22 NY3d 473 [2014]).
In this case, the essential conduct at issue involves the paramedics/ALS team rendering advanced medical treatment when indicated. Upon arrival, the ALS paramedics took Decedent's medical history, checked his pulse, breathing, and oxygen saturation, and in response to their evaluation, they initiated six-liter supplemental oxygen support and medications, and called for support from an additional BLS unit to take Decedent downstairs to an ambulance. They did not sedate and intubate the patient at any time between their arrival at his home and drop-off at Coney Island Hospital (approximately 4:45 a.m. to 5:30 a.m.), though this was within their "scope of practice" and an option available to them, subject to calling a physician for approval (Almandoz deposition tr, at 12, 41-42).
Given the limited and highly fact-specific case law available, this Court cannot find as a matter of law that the ALS paramedics in this case were performing a "governmental function" and not acting in a proprietary capacity when they administered acute medical treatment and care to Decedent at his home and en route to the hospital. In Dixon, the claims against the ALS ambulance were based in alleged delays to take the plaintiff to a hospital for a surgery far outside the scope of their practice. Where the claim is rooted in medical malpractice, and the relevant parties have the training and equipment to provide more than the minimum of basic life support techniques — they are in fact authorized by law to provide sophisticated medical care "on site or en route to, from, or between general hospitals" (Public Health Law § 3001) — it is harder to distinguish their actions from the personnel in the emergency department of city-run hospitals, who are well established to be acting in a "proprietary" capacity and subject to the same liability standards of private physicians, nurses, and other medical staff.
As the movants have not established that the City's ALS paramedics were acting in a governmental capacity, rather than a proprietary one, the analysis of discretionary/ministerial function and "special duty" need not be reached. Further, as the City Defendants have provided no expert affirmation, there is no prima facie establishment of entitlement to summary judgment [*7]on the basis of compliance with the standard of care or proximate causation.
To the extent that Plaintiff asserts any claims against the City involving the acts and omissions of basic life support EMTs, however, such claims must be dismissed. The Applewhite holding and subsequent case law is clear that rendering basic emergency medical services and facilitating hospital transport is a classic governmental function subject to immunity defenses. Plaintiff raises no issue of fact nor any argument that the BLS unit was performing a non-discretionary (ministerial) function or that there was a special, affirmative duty assumed toward the plaintiff/decedent by the BLS technicians. Therefore, the City Defendants' motion is granted as to the acts or omissions of the BLS team. As discussed above, the allegations of medical malpractice by the ALS paramedics remain intact.
Accordingly, the branch of the City Defendants' motion seeking summary judgment in favor of the City of New York on the basis of governmental immunity is granted only to the extent of dismissing any claims involving the basic EMTs/non-ALS paramedics, and the motion is otherwise denied.
Turning to the remaining Defendants' motions, "[i]n determining a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party" (Stukas v Streiter, 83 AD3d 18, 22 [2d Dept 2011]). In evaluating a summary judgment motion in a medical malpractice case, the Court applies the burden shifting process as summarized by the Second Department:
"The elements of a medical malpractice cause of action are a deviation or departure from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries. When moving for summary judgment, a defendant provider has the burden of establishing the absence of any departure from good and accepted medical practice or that the plaintiff was not injured thereby. In order to sustain this burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's bill of particulars. In opposition, the plaintiff must demonstrate the existence of a triable issue of fact as to the elements on which the defendant has met his or her initial burden. General allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice, are insufficient to defeat a defendant's summary judgment motion. Although summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions, expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (Barnaman v Bishop Hucles Episcopal Nursing Home, 213 AD3d 896, 898-899 [2d Dept 2023] [internal quotation marks and citations omitted].
In support of Dr. Fariwa's summary judgment motion (Seq. No. 9), the movant submits an expert affirmation from Brian Moynihan, D.O. ("Dr. Moynihan"), a licensed physician who is board-certified in family medicine, as well as medical records and deposition transcripts.
Based on the record and his expertise, Dr. Moynihan opines that all treatment and care rendered to Decedent by Dr. Fariwa on December 25 and December 26 was within good and accepted medical standards. When Decedent first presented with complaints including shortness of breath and fever, Dr. Moynihan opines that he was appropriately referred to the emergency department at Maimonides to rule out DVT (deep vein thrombosis), pneumonia, or bronchospasm. Dr. Moynihan notes that Dr. Fariwa "checked on" Decedent and performed a [*8]"brief examination" while he was a patient at Maimonides as a courtesy, but he opines that Dr. Fariwa was not responsible for any decisions regarding his treatment or discharge from Maimonides. Further, Dr. Moynihan opines that Dr. Fariwa appropriately relied on the Maimonides physicians' determination that Decedent was negative for pneumonia, and that Dr. Fariwa had no obligation under the standard of care to independently review or interpret the chest x-ray images from Maimonides.
Dr. Moynihan notes that when Decedent followed up with Dr. Fariwa on December 26, Dr. Fariwa prescribed Zithromax (an antibiotic) to substitute the Doxycycline he was prescribed at the hospital because he could not tolerate Doxycycline. He also prescribed Prednisone and Albuterol nebulizer solution. Dr. Moynihan states that it is "unclear" whether Dr. Fariwa prescribed Tamiflu (an antiviral used to treat influenza) on December 26 or the following day, but that it was prescribed at some time following his discharge, based on Plaintiff-administrator's testimony that she picked up prescriptions and saw him take the medication. Dr. Moynihan opines that these were all proper medications for Decedent's bronchitis and influenza diagnosis.
Dr. Moynihan further opines that based on Decedent's presentation on December 26, it was not warranted to refer him back to a hospital for a repeat chest x-ray or other testing. According to Dr. Moynihan, the standard of care would be to order a follow-up chest x-ray in 30 days, unless his symptoms worsened or did not improve. Dr. Moynihan opines that Dr. Fariwa complied with this standard, because according to his notes Decedent reported his shortness of breath "showed improvement" and was "better" from the previous day. Dr. Moynihan also notes that the patient was already taking Zithromax/Doxycycline, a proper outpatient treatment for community acquired pneumonia, so he opines there was nothing further Dr. Fariwa could have done if or when Decedent was diagnosed with pneumonia.
Dr. Moynihan relies on the testimony and office records of Dr. Fariwa that he did not see or have any further contact with Decedent after the December 26 visit, despite his advice that Decedent should follow up with him the following day.
Finally, Dr. Moynihan opines without detail that Decedent's condition worsened between December 27-31 and that no treatment provided by Dr. Fariwa was the proximate cause of that decline.
Based on the submissions, Dr. Fariwa fails to meet his prima facie burden of entitlement to summary judgment. The expert's only basis for the opinion that Decedent was "clinically significantly improved" on the December 26 follow-up visit is a note that his shortness of breath "showed improvement" from the previous day, yet Dr. Fariwa also noted "bilateral wheezing" on examination. Dr. Moynihan also opines that Dr. Fariwa prescribed appropriate medications to Decedent, including Tamiflu, but his own affirmation expresses uncertainty what date it was prescribed. The expert cites testimony from Plaintiff-administrator saying she simply "picked up medication" but did not recall him taking Tamiflu specifically. Decedent's mother testified that he was first told he had the flu and given Tamiflu the Friday (December 29) before his death. The pharmacy records submitted by Plaintiff in opposition confirm only that Dr. Fariwa prescribed Prednisone, Doxycycline, Zithromax, and Albuterol Sulfate on December 26 and prescription-strength Ibuprofen on December 27.
There are also significant unresolved issues of fact as to whether Dr. Fariwa had any contact with Decedent or was apprised that his condition worsened between December 27-30. The movant's expert argues that there were no departures from the standard of care on December 25 or 26 and relies on Dr. Fariwa's testimony that those were his only interactions with [*9]Decedent. However, this is disputed by Decedent's mother, who testified that she took her son to Dr. Fariwa "two or three times" after his visit to the Maimonides emergency department. The expert relies on the absence of office notes or billing entries after December 26, but acknowledges that not all office visits in Dr. Fariwa's records had corresponding billing entries.
"The function of the court on a motion for summary judgment is not to resolve issues of fact or determine matters of credibility, but merely to determine whether such issues exist" (Khutoryanskya v Laser & Microsurgery, P.C., 222 AD3d 633, 635 [2d Dept 2023], quoting Kolivas v Kirchoff, 14 AD3d 493 [2d Dept 2005]). In light of the movant's expert opinions which are conclusory and controverted by the record, Dr. Fariwa has not eliminated all issues of fact as to his alleged departures from the standard of care. The expert's conclusory opinions on Decedent's decline between December 27-30 are also insufficient to establish that this decline was not proximately caused by acts or omissions of Dr. Fariwa.
Notwithstanding Dr. Fariwa's inability to establish prima facie entitlement to summary judgment, Plaintiff raises issues of fact which withstand such a motion. In opposition to Dr. Fariwa's motion, Plaintiff submits an expert affirmation from a licensed physician certified in internal medicine and pulmonary disease, (name of expert redacted). The Court was presented with a signed, unredacted copy of the affirmation for in camera inspection.
Plaintiff's expert opines that a referral to the ER for a repeat x-ray was warranted by Decedent's symptoms during the December 26 visit. The defendant's expert Dr. Moynihan noted that the standard of care would require a repeat x-ray if Decedent's symptoms were not improving or getting worse. Plaintiff's expert notes that although Dr. Fariwa recorded Decedent's shortness of breath "showed improvement," he also found "bilateral wheezing" upon examination which was not present in the ER exam, and therefore there was evidence Decedent's symptoms were in fact not improving and getting worse. Further, while Dr. Moynihan opines that the primary care physician was not required to independently evaluate the radiological studies, Plaintiff's expert opines that Dr. Fariwa should have at least read the radiological report, which noted the study was limited. The expert opines that the standard of care required Dr. Fariwa to refer the patient for another x-ray for this reason.
Plaintiff's expert further counters the opinions of Dr. Moynihan on causation. The defendant expert stated that there was nothing further Dr. Fariwa could have done on December 26 to prevent the worsening of Decedent's pneumonia, since he had already been prescribed antibiotic and antiviral medications. In contrast, Plaintiff's expert opines that if Decedent had been referred back to the ER and diagnosed with pneumonia at that time, he could have also been monitored in a hospital setting due to his comorbidities, and his condition would not have ultimately progressed to ARDS. Dr. Moynihan also acknowledges the record is unclear as to when Dr. Fariwa prescribed Tamiflu to the patient, and Plaintiff's expert opines that any delay after he was informed of the positive flu test on December 26 was a departure from the standard of care, as "the efficacy of treatment decreases with each passing day."
Additionally, Plaintiff points to disputes in the testimony and pharmacy record as to whether Decedent was treated by Dr. Fariwa after December 26. Dr. Fariwa acknowledged in his deposition that he wrote a prescription for Ibuprofen on December 27, which he initially said he did not recall but later testified was on the request of Decedent's father for unrelated pains. Plaintiff's expert opines that this explanation, even if taken at face value, would constitute a departure from the standard of care by prescribing medication without seeing and evaluating the patient, especially in light of his symptoms on the previous days and his risk of complications. [*10]Plaintiff's expert also opines that Ibuprofen was a counterproductive treatment because it would not treat his illness and "would only act to reduce the fever, masking his underlying worsening clinical status."
In summary, Dr. Fariwa has failed to meet his prima facie burden of eliminating issues of fact as to departures from the standard of care or proximate causation. Even if he had met this burden, there are multiple issues of fact raised by Plaintiff's opposing expert, which preclude summary judgment for Dr. Fariwa on those issues and must be left to a trier of fact.
Notwithstanding the above, Dr. Fariwa does establish prima facie that he is entitled to summary judgment on Plaintiff's cause of action for lack of informed consent. This claim is not applicable to Dr. Fariwa, as the theory of informed consent is limited to cases involving performance of a "non-emergency treatment, procedure or surgery" or "a diagnostic procedure which involved invasion or disruption of the integrity of the body" (Deutsch v Chaglassian, 71 AD3d 718, 720 [2d Dept 2010], quoting Public Health Law § 2805-d [2]). The cause of action does not arise where, as here, there is no assertion that the physician performed any procedure or "affirmative violation of the plaintiff's physical integrity" during the treatment and care at issue (Samer v Desai, 179 AD3d 860, 864 [2d Dept 2020]). Plaintiff's claims against Dr. Fariwa relate to his evaluation and treatment of his pulmonary symptoms and do not involve any affirmative physical violation, and Plaintiff does not raise any issues of fact in opposition related to lack of informed consent. Therefore, summary judgment is granted to the extent of dismissing Plaintiff's claims on lack of informed consent only.
In support of Dr. Mathew and Maimonides's summary judgment motion (Seq. No. 12), the movants submit an expert affirmation from Mark Silberman, M.D. ("Dr. Silberman"), a licensed physician certified in emergency medicine, critical care medicine, pulmonary medicine, and internal medicine.
Dr. Silberman opines that Maimonides, through its agents and employees including Dr. Mathew, acted in accordance with the standard of care during Decedent's presentation in the ER on December 25 through his discharge in the early morning hours of December 26. Dr. Silberman opines that based on his physical examination and radiological study at the time of the ER visit, Decedent did not have pneumonia at that time. Dr. Silberman opines that appropriate testing for influenza, blood labs, and a chest x-ray were performed, and that Decedent's venous blood gas study did not indicate acute respiratory failure. Based on his presentation and symptoms, Dr. Silberman opines that it was reasonable to initially diagnose him with bronchitis, then update to a more specific diagnosis of influenza after the flu test result.
Dr. Silberman also opines, based on his review of the chest x-ray, that the image was "sufficient to demonstrate there was no evidence of acute pulmonary disease, including pneumonia." He opines that it is not unusual for a larger patient to have "limited by body habitus or poor penetration" noted in the report, but this did not render the study inadequate for the purpose of diagnosing pneumonia and the standard of care did not require a repeat or additional test. In the expert's opinion, the December 25 chest x-ray showed sharply defined borders of the heart and diaphragm and no focal consolidation in the lung feelings suggesting pneumonia.
Dr. Silberman further opines that it was appropriate for Dr. Mathew to discharge Decedent from the emergency room on December 26. Dr. Silberman notes that his vital signs were monitored throughout his time at Maimonides, and his oxygen saturation was last measured at 98% before he was discharged. Dr. Silberman also notes that out of ten oxygen saturation tests, only two were below 95%, (93% at 10:32 p.m. and 91% at 2:31 a.m.) and those rose after [*11]repeat tests. Additionally, Dr. Silberman opines that it is not outside the standard of care to discharge a patient while the results of a flu test are still pending. He opines that Dr. Mathew timely and appropriately reached out to Decedent's primary care physician, Dr. Fariwa, to inform him of the flu diagnosis and recommend that he prescribe Tamiflu, and Decedent did follow up with Dr. Fariwa the same day. Dr. Silberman opines that there was no reason to admit Decedent to the hospital at that time, as he did not require treatment apart from the flu medication, and that the standard of care did not require further observation in a hospital setting merely because of the possibility that Decedent's influenza "might possibly go on to subsequently develop pneumonia."
Finally, Dr. Silberman opines that Decedent likely developed pneumonia as a complication of influenza after he presented at Maimonides "despite proper treatment." Dr. Silberman explains that secondary pneumonia "usually happens several days after the flu manifests," and this may lead to a "rapid and catastrophic" decline in a person with comorbidities such as the Decedent. Dr. Silberman bases this opinion on the fact Decedent was admitted to Coney Island Hospital with ARDS five days later, and he opines this condition would have worsened more quickly if he already had pneumonia at the time of his Maimonides visit. Therefore, Dr. Silberman opines that there were no acts or omissions on the part of Dr. Mathew or Maimonides which proximately caused Decedent's injuries and death. In Dr. Silberman's opinion, Decedent did not have pneumonia at the time he visited Maimonides, he received a proper diagnosis and treatment for influenza, and there was nothing further that should have been done in accordance with the standard of care that would have prevented him from developing secondary pneumonia after that visit.
To the extent that Dr. Silberman opines on the ECMO team from Maimonides that was contacted on December 31, Plaintiff asserts no claims related to this treatment in the bill of particulars, nor addresses any such claims in their expert affirmations in opposition to this motion. These claims are therefore not part of the Court's consideration.
Based on the submissions and expert affirmation, Dr. Mathew and Maimonides have met their prima facie burden of showing there were no departures from the standard of care during Decedent's December 25-26 ER visit, and the alleged departures did not proximately cause Decedent's injuries or death. The burden therefore shifts to Plaintiff to raise an issue of fact.
In opposition to Dr. Mathew and Maimonides' motion, Plaintiff submits their expert affirmation from a licensed physician certified in internal medicine and pulmonary disease, (name of expert redacted); an expert affirmation from a licensed physician certified in emergency medicine, (name of expert redacted); and an expert affirmation from a licensed physician certified in diagnostic radiology. The Court was presented with signed, unredacted versions of all three affirmations for in camera inspection.
Plaintiff's radiology expert opines that the Maimonides radiologist, Dr. Giordano, departed from the standard of care by misinterpreting the chest x-ray result and by not recommending additional or repeat imaging studies. Plaintiff's expert counters the opinion of defendant's expert that further testing was not warranted by the fact the study was limited by poor penetration and body habitus. In the opinion of Plaintiff's expert, these limitations made the study inadequate for ruling out pneumonia, and the standard of care required the radiologist to request or recommend a repeat chest x-ray, additional views, or a CT scan, due to the deficient image.
Additionally, Plaintiff's radiology expert opines that the December 25 chest x-ray, despite [*12]its limitations, did show signs of pneumonia, and Dr. Giordano's impression that it was a negative study was inaccurate and a departure from the standard of care. Plaintiff's expert reviewed the image and concluded that there were visible signs including "prominent right hilium, increased interstitial markings throughout the right lung, and right lower lobe consolidation." The expert opines that Dr. Giordano departed from the standard of care by failing to "document these abnormalities" which indicated "pulmonary disease highly suggestive of pneumonia."
Plaintiff's emergency medicine expert also opines that Decedent showed clinical signs of respiratory complications outside of the chest x-rays, and therefore he should not have been discharged but admitted to the hospital. During his emergency department treatment, Decedent's arterial blood gas (ABG) was not measured. Only a venous blood gas (VBG) study, which the defendant's expert opined "did not demonstrate acute respiratory failure," was performed. Countering the statements of Dr. Silberman that the VBG result (89%) did not show "acute respiratory failure," Plaintiff's expert opines that it clearly showed Decedent was hypoxic and an arterial blood gas study should have been taken for a more accurate result. Plaintiff's emergency medicine expert also disputes the opinion of Dr. Silberman with regard to Decedent's oxygen saturation, noting that his oxygen saturation was still abnormally low at 2:31 a.m. (91%) even though he had increased from two liters to four liters of supplemental oxygen. The oxygen saturation readings are unclear as to whether Decedent was using supplemental oxygen or "room air" at the time they were taken, particularly as the readings themselves fluctuate within minutes. Near the time of Decedent's oxygen saturation reading of 97% at 11:30 p.m., a nursing note recorded that he had labored breathing with a 4L nasal cannula. Plaintiff's expert opines that "the only appropriate way to rule out hypoxia" would be to remove him from supplemental oxygen for 45 minutes to an hour and check his vitals again. For this reason, Plaintiff opines that it was a departure from the standard of care to discharge Decedent from the emergency department less than an hour after the 2:31 a.m. (91%) and 2:34 a.m. (98%) measurements, instead of continuing to monitor his oxygen levels on room air.
The emergency medicine expert also opines that Dr. Mathew should have ordered a repeat x-ray due to the comments on the report that it was limited by his body habitus and poor penetration. Like the radiology expert, this expert also opines that there was "clear evidence of right-sided pneumonia" from their review of the chest x-ray image. The expert counters Dr. Silberman's opinion that the pneumonia developed after Decedent's discharge or it would have progressed more quickly. Instead, the expert opines that due to Decedent's young age, his body fought the disease as it progressed over the course of five to six days, until he experienced acute respiratory failure on December 31.
The emergency medicine expert acknowledges that the timing of the flu test result was not unreasonably delayed, but Decedent should not have been discharged from Maimonides regardless due to his signs of pneumonia. The expert opines that under the appropriate standard of care, he should have been admitted to the hospital from the emergency department in light of clinical and radiological findings, and his comorbidities which put him at high risk of hypoxia and other pulmonary complications. In the expert's opinion, a patient in these circumstances "required continued monitoring in a hospital setting of his vital signs including his oxygenation." The expert opines that a hospital admission at this stage of his illness would have allowed him to receive repeat chest imaging studies to monitor the improvement or worsening of his symptoms, and supportive care including "fluids and supplemental oxygen as well as treatment of his [*13]influenza and antibiotic therapy to prevent any secondary infection," all of which would have vastly improved his chance of survival and made his death avoidable.
Finally, Plaintiff's internal medicine and pulmonary disease expert offers the same overall opinions as the emergency medicine expert with regard to Dr. Mathew and Maimonides' alleged failures to properly interpret the chest x-ray or order additional studies. The expert opines that based on the record, Decedent was misdiagnosed with bronchitis when he demonstrated radiological signs of pneumonia, and it was a departure from the standard of care to discharge him rather than admit him to the hospital for continued monitoring and treatment.
Plaintiff raises clear issues of fact and conflicting expert opinions which must be resolved by a jury. The very issue of whether Decedent's pneumonia developed after his treatment at Maimonides or was present and misdiagnosed on December 25 is disputed in detail by the parties' experts. In reply, the movants argue that Plaintiff's experts inconsistently opine that the poor penetration of the x-ray warranted further radiological studies to rule out pneumonia, while also opining that the image was already "highly suggestive of pneumonia." However, this Court finds no contradiction between these statements. The experts' opinions support Plaintiff's allegation that Dr. Mathew and the radiologist deviated from the standard of care and that Decedent did have pneumonia at the time of his emergency department visit, which should have been confirmed by further imaging. Additionally, Plaintiff's experts raise issues of fact as to whether Dr. Mathew and Maimonides departed from the standard of care by discharging Decedent rather than admitting him to the hospital, in light of his venous blood gas and oxygen saturation readings. Finally, Plaintiff's experts counter Dr. Silberman's opinion on proximate causation, opining that Decedent's pneumonia — which put him at high risk for further complications — did not develop after his Maimonides discharge but was already present and misdiagnosed, and therefore the alleged failure to continue monitoring him in a hospital setting was a proximate cause of his injuries and death.
Notwithstanding the above, for the same reasons discussed in Dr. Fariwa's motion, the claim of lack of informed consent is not applicable to Plaintiff's allegations against Maimonides or Dr. Mathew, and Plaintiff raises no opposition to the branch of the motion seeking to dismiss that claim against them. Accordingly, Dr. Mathew and Maimonides' motion is granted to the extent of granting summary judgment on the issue of lack of informed consent, only, and dismissing said claim against the movants. The motion is otherwise denied.
Lastly, in support of Defendant NYCHHC/Coney Island Hospital's motion for summary judgment (Seq. No. 11), the movant submits an expert affirmation from Steve Salzman, M.D. ("Dr. Salzman"), a licensed physician certified in internal medicine, pulmonary disease, and critical care medicine.
Contrary to Plaintiff's argument in opposition, this Court finds that Dr. Salzman is a qualified expert to opine on the intubation timeline and other relevant treatment rendered to the Decedent. Although he is not certified in emergency medicine, he is certified in pulmonary disease and critical care, and further avers that he has treated patients admitted from hospital emergency departments in critical condition. The Court finds he has established a proper foundation that he is "possessed of the requisite skill, training, education, knowledge or experience from which it can be assumed that the opinion rendered is reliable" (DiLorenzo v Zaso, 148 AD3d 1111, 1112-1113 [2d Dept 2017]). The opinions rendered relate to Decedent's intubation, a topic directly related to pulmonary and critical care, the areas in which he has established his relevant expertise.
Dr. Salzman opines that it was not a departure from the standard of care to place Decedent on a non-invasive BiPAP machine to deliver oxygen at approximately 5:50 a.m., before proceeding to tracheal intubation and mechanical ventilation sometime between 6:45 a.m. and 7:30 a.m. Dr. Salzman opines that the less invasive ventilation measure was "appropriate as he reasonably might have rapidly improved with treatment for asthma and pulmonary edema," and this would have avoided the need for intubation. In addition, Decedent was initiated on albuterol/Atrovent (nebulizer), solumedrol, and magnesium sulfate. In Dr. Salzman's opinion, it was appropriate to initiate medications and employ BiPAP as a "trial run of sufficient length to see if it was possible to improve the patient's condition without the use of the ventilator," due to the various risks associated with intubation.
Dr. Salzman bases his opinion on the records as well as an affirmation from Dr. Shestak, who avers that intubation-related medications were initiated "at or around 6:45 a.m." and intubation was accomplished "in a matter of minutes thereafter." Though there are inconsistencies in the Coney Island Hospital chart as to exactly what time Decedent was intubated, the record indicates it was completed at earliest shortly before 6:58 a.m. (first ventilation mode settings recorded) and no later than 7:38 a.m. (procedure note entered by Dr. Patel). Though most evidence in the record points to these events occurring near 7:00 a.m., Dr. Salzman opines that even if intubation was ordered as late as 7:38 a.m., it would not be a departure from the standard of care to wait until that time to see if Decedent's condition improved on BiPAP. Thus, Dr. Salzman opines that the exact timing of the intubation is not a material issue of fact, because even intubation at 7:38 a.m. would not have been a departure from the standard of care.
Dr. Salzman further opines that once Decedent was intubated, the ventilator settings were increased progressively at appropriate levels, and he was appropriately given intravenous paralytic agents to improve oxygenation so he would not "fight the ventilator." Dr. Salzman opines that Dr. Shestak timely consulted with MICU specialists and implemented the recommended ventilator settings. He also opines that it was not required under the standard of care in 2017 for a hospital to have its own ECMO team, as this was "last resort" measure rather than a widespread or conventional treatment. Under the applicable standard of care, he opines that it was "appropriate for hospitals to enter into agreements with another hospital that had an ECMO team in order to avail themselves of that salvage treatment." Therefore, he opines it was within the standard of care to call the nearby Maimonides ECMO team for assistance while taking all appropriate measures with more conventional treatment until they arrived. Additionally, Dr. Salzman opines that Decedent's condition was too critical and unstable for him to be transferred safely to another facility.
On the issue of proximate causation, Dr. Salzman opines that Decedent's condition was "too far advanced to be corrected" by the time he was admitted to Coney Island Hospital, due to ARDS caused by pneumonia and his chronic conditions including congestive heart failure, obesity, and sleep apnea. Dr. Salzman opines that even though he was treated within the standard of care at Coney Island Hospital, "his lack of response to rapidly escalating therapies for ARDS," including very high oxygen concentration on the ventilator, evinced that his worsening respiratory distress and death could not have been prevented.
Based on the expert's submissions, NYCHHC has established prima facie entitlement to summary judgment on the issues of alleged departures from the standard of care and proximate causation.
In opposition, Plaintiff submits an expert affirmation from a licensed physician certified in internal medicine and pulmonary disease, (name of expert redacted), and an expert affirmation from a licensed physician certified in emergency medicine, (name of expert redacted). The Court was presented with signed, unredacted versions of these affirmations for in camera inspection.
Based on the records and their relevant expertise, Plaintiff's emergency medicine expert opines that Coney Island Hospital, through its agents and employees, departed from the standard of care by not timely intubating Decedent and by delaying his placement on a mechanical ventilator for 40-90 minutes. Upon Decedent's presentation at Coney Island Hospital at approximately 5:50 a.m., the expert notes Decedent was in acute respiratory distress with elevated pulse (126), respirations (28 breaths per minute), and critically low oxygen saturation (60%), all of which were noted on his first examination above the plan of BiPAP and "intubation if no improvement." Decedent also had bilateral rales and wheezing on examination. The expert notes his oxygen saturation of 60% on room air had not improved since it was measured by EMS at 4:50 a.m., indicating that at that point Decedent had been "severely hypoxic and hypotensive for one hour." Plaintiff's expert therefore opines that it was a departure from the standard of care not to intubate him immediately from the time Dr. Shestak ordered his initial plan to start BiPAP at 6:05 a.m. Plaintiff's expert counters Dr. Salzman's opinion that Decedent's condition may have rapidly improved with less invasive therapies and calls this assumption "completely unreasonable" given his presentation at the emergency department.
Plaintiff argues that whether the intubation occurred at 6:45 a.m. or 7:30 a.m. is a significant issue of fact which may point to an even longer delay in appropriate oxygen treatment. Notwithstanding that discrepancy in the record, however, Plaintiff's expert argues that intubation at 6:45 a.m. alone would constitute a departure from the standard of care, opining there was an unreasonable delay of 40 minutes where Decedent should have been placed directly on a mechanical ventilator as the "very first form of treatment" rather than BiPAP.
Plaintiff's emergency medicine expert also counters Dr. Salzman's opinion on proximate causation, opining that Decedent's probability of survival would have improved if he was intubated closer to his arrival at 6:00 a.m. The expert opines that complications associated with ARDS can be reduced by timely providing supportive therapies including mechanical ventilation. The expert also opines that immediate intubation was "indicated and warranted" from Decedent's vital signs when he was first treated by ALS paramedics, and the need for intubation remained even more urgent when he arrived at Coney Island Hospital. The expert opines that not being intubated for at least an hour — and up to two hours — from Decedent's initial onset of severe hypoxia was a "substantial contributing factor to his death."
Additionally, Plaintiff's internal medicine and pulmonary disease expert expresses a similar opinion that Coney Island Hospital departed from the standard of care by failing to intubate Decedent "without any further delay" as early as 6:05 a.m., based on his symptoms, vital signs, and radiographic tests upon presentation in the emergency department. The expert also opines that because he had already been hypoxic for over an hour since the ambulance team arrived at 4:50 a.m., and mechanical ventilation reduces the rate of ARDS complications, this delay was a substantial contributing factor in his death.
Plaintiff's experts raise an issue of fact as to whether it was a departure from the standard of care for Coney Island Hospital to employ BiPAP oxygenation rather than intubating Decedent as soon as possible. Viewing the evidence in the light most favorable to non-moving Plaintiff, there are not only inconsistencies as to when Decedent was actually intubated, but also [*14]conflicting expert testimony as to the standard of care and the hospital's decision to utilize non-invasive oxygen therapies for at least forty minutes before intubation. Plaintiff's experts also sufficiently rebut the opinions of Dr. Shestak on proximate causation, opining that despite Decedent's high-risk comorbidities at the time he arrived at the emergency department, his chances of avoiding complications from ARDS would have been improved by mechanical ventilation as soon as he arrived, rather than 40-90 minutes later, given he had already been hypoxic before arrival. These issues preclude summary judgment and must be resolved by a jury, and summary judgment is therefore denied.
Accordingly, it is hereby:
ORDERED that Dr. Fariwa's motion (Seq. No. 9) for an Order, pursuant to CPLR 3212, granting summary judgment in his favor, dismissing Plaintiff's complaint against him in its entirety, and amending the caption to remove Dr. Fariwa, is GRANTED TO THE EXTENT of dismissing Plaintiff's claims for lack of informed consent, and the motion is otherwise DENIED; and it is further
ORDERED that the City Defendants' motion (Seq. No. 10) for an Order, pursuant to CPLR 3211 (a) (7) or CPLR 3212, dismissing the complaint and all cross claims against them, is GRANTED TO THE EXTENT of dismissing the complaint against Emergency Medical Services of New York City Fire Department, as it is a non-suable entity, and dismissing any claims related to the actions of the basic life support EMTs, and the motion is otherwise DENIED; and it is further
ORDERED that NYCHHC's motion (Seq. No. 11) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing Plaintiff's complaint against them in its entirety, is DENIED; and it is further
ORDERED that Dr. Mathew and Maimonides's motion (Seq. No. 12) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing Plaintiff's complaint and all cross claims against them, is GRANTED TO THE EXTENT of dismissing Plaintiff's claims for lack of informed consent, and the motion is otherwise DENIED; and it is further
ORDERED that NYCHHC's motion (Seq. No. 13) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor on the issue of informed consent only, is GRANTED; and it is further
OREDERED that the caption is amended as follows:
SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF KINGS
--------------------------------------------------------------------------------------X
LEJLA BILAJAC, as the Administrator of the Estate of OSCAR 
EDUARDO EUCEDA, JR., deceased,   
       Plaintiff, 
     -against- 
VICTOR ZAKI FARIWA, M.D., AMY ROSE MATHEW, M.D., CITY OF NEW YORK, CONEY ISLAND HOSPITAL, NEW 
YORK CITY HEALTH AND HOSPITALS CORPORATION and MAIMONIDES MEDICAL CENTER,          Defendants.
-------------------------------------------------------------------------------------X
This constitutes the decision and order of this Court.
ENTER.
Hon. Consuelo Mallafre Melendez
J.S.C.